AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of New York

19MJ 01806

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| KWASI ASARE | ) | 19 0376M |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    KWASI ASARE

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☑ Complaint

☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

Date: _____04/19/2019_____

_____
*Issuing officer's signature*

City and state:    CENTRAL ISLIP, NEW YORK

U.S.M.J. ANNE Y. SHIELDS
*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |
| Date: _____      _____<br>*Arresting officer's signature* |
| _____<br>*Printed name and title* |

LTG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

KWASI ASARE,
MARK LAMICKA,
    also known as Mark Lamica
    and Mark Lomicka,
JAMES GANIERE and
KEVIN CARRIKER,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

C O M P L A I N T

(18 U.S.C. § 1349)

0376M

19MJ 01806

EASTERN DISTRICT OF NEW YORK, SS:

    MATTHEW GALIOTO, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation, duly appointed according to law and

acting as such.

    In or about and between July 2018 and the present, within the Eastern District

of New York and elsewhere, the defendant KWASI ASARE, MARK LAMICKA, also known

as Mark Lamica and Mark Lomicka, JAMES GANIERE and KEVIN CARRIKER, together

with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud

investors and potential investors, and to obtain money and property by means of materially

false and fraudulent pretenses, representations and promises, and for the purpose of executing

such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and

Case 2:19-mj-01806-DUTY Document 3 Filed 05/01/19 Page 3 of 19 PageID #:5

2

sounds, contrary to Title 18, United States Code, Section 1343, to wit: emails and a wire transfer.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his/her belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been involved in the investigation of numerous cases involving financial fraud, including various schemes to defraud investors and potential investors.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including emails, text messages, bank records and the defendants' criminal history records; and from reports of other law enforcement officers involved in the investigation, including recordings made by a federal agent working for the FBI in an undercover capacity ("FBI-UC").

2.      In July 2018, an attorney representing an entertainment company (the "Attorney"), which represents Rihanna, a performance artist, contacted the FBI to report that the defendant KWASI ASARE and others were soliciting investors and potential investors in an attempt to raise $19.5 million with a return of investment of 22% ($24,095,363) by falsely claiming that they were authorized to raise capital for Rihanna's 2018-2019 Tour.   The Attorney forwarded an email solicitation to the FBI, including a slide deck presentation that was emailed by defendant ASARE on July 13, 2018, utilizing a gmail account, to a potential

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

Case 2:19-mj-01806-DUTY Document 3 Filed 05/01/19 Page 4 of 19 PageID #:6

3

investor.[2]  Both the Attorney and representatives of Rihanna were interviewed by the FBI and each denied knowing defendant KWASI ASARE, denied that Rihanna had agreed to do the tour and denied that defendant ASARE was authorized to raise capital on behalf of Rihanna for this tour or any other tour.

> 3.      Later in July 2018, the FBI-UC, posing as an investor, was introduced to defendant ASARE through a third party.  Thereafter, from July 2018 to the present, the FBI-UC communicated with defendant ASARE via email, cellphone calls and text messages.[3] Also, the FBI-UC and defendant ASARE met on several occasions in person to discuss various investment opportunities.[4]  In those electronic and in-person communications, defendant ASARE regularly solicited the FBI-UC to invest funds in various purported concert tours, including but not limited to concert tours of several well-known performance artists.  After ASARE made these representations, FBI Agents interviewed various managers and other employees of the performance artists and ascertained that ASARE was unknown to any of the performance artists or their staff, and, in any event, did not have authorization to raise capital on their behalf.  Equally important, none of the artists had firm plans to even tour during that period or for the specific tours as described by defendant ASARE.

---

[2]      As Google, the parent company of gmail, maintains no servers in New York State, any email sent to or from a gmail account must travel in interstate commerce to leave from, or arrive in, New York.

[3]      The FBI-UC has maintained all of the written communications between himself and each of the defendants.  Similarly, the FBI-UC has documented the verbal interactions with the defendant via audio recording.

[4]      These in-person meetings were recorded by the FBI-UC via audio and/or video recording.

Case 2:19-mj-00376-AYS  Document 6-3  Filed 05/06/19  Page 5 of 19 PageID #:38
Case 2:19-mj-01806-DUTY  Document 3  Filed 05/01/19  Page 5 of 19  PageID #:7

4

4.     Then, on November 13, 2018, defendant ASARE sent the FBI-UC an email introducing the prospect of a $4 million investment in a one-off concert of another performer artist, Bruno Mars, purportedly promoted by Rio Vista Universal, an entertainment company based in Los Angeles, California, at Petco Park in San Diego, California on March 2, 2019 ("the Petco Park Show"), which defendant ASARE represented was "led by industry veteran Mark Lamica."

5.     On November 14, 2019, defendant ASARE met in person with the FBI-UC in Manhattan.  During that meeting, defendant ASARE advised the FBI-UC that he was familiar with defendants MARK LAMICA and JAMES GANIERE of Rio Vista Universal. Defendant ASARE described defendant LAMICA as "the man" and advised that defendants LAMICA and GANIERE "got" the Petco Park Show deal, as defendant GANIERE has "the artist and venue locked up." Specifically, according to defendant ASARE, Bruno Mars promised defendant GANIERE that he (Bruno Mars) would do the show as long as defendant GANIERE raised the money necessary to fund the show.

6.     After defendant ASARE made these representations, FBI Agents interviewed Bruno Mars's manager and Bruno Mars's business partner and ascertained that defendant ASARE was unknown to Bruno Mars, and, in any event, did not have authorization to raise capital on Bruno Mars's behalf.  Equally important, Bruno Mars never agreed to do the Petco Park Show, nor had anyone even made him such a proposition.

7.     Then, on February 14, 2019, defendant ASARE sent an email to the FBI-UC in which defendant ASARE began to solicit the FBI-UC to invest $20 million in a concert tour headlined by Janet Jackson later in calendar year 2019 (the "2019 JJ Concert Tour"). Defendant ASARE represented in the email that "Mark Lamica and Rio Vista Universal are

Case 2:19-mj-01806-DUTY Document 3 Filed 05/01/19 Page 6 of 19 PageID #:8

comanaging Janet with Randy Jackson going forward." Defendant ASARE further represented in the email that "this current tour routing [for Janet Jackson] is for US Stadium dates" and "these dates have a GUARANTEED/INSURED Return of 10% per date and 32% Return over 16 dates or $6.4mm versus $20mm investment." Finally, defendant ASARE set up a call with Mark Lamica "regarding this US tour routing."

8.      Thereafter, on February 20, 2019, defendants ASARE and GANIERE and others participates in a telephone conference call with the FBI-UC. During that call, GANIERE confirmed the 2019 JJ Concert Tour and represented that defendant LAMICA had an in-person meeting with Janet Jackson and that during that meeting Janet Jackson personally committed to the 2019 JJ Concert Tour and discussed having the Jackson 5 open for her. Defendant GANIERE also guaranteed a high rate of return on this investment, specifically promising the FBI-UC a $400,000 profit from each of the 16 shows of the 2019 JJ Concert Tour. Finally, defendant GANIERE stated that "we" have been talking to "Janet" for a long time about the tour, and defendant LAMICA took the "lead" on Janet's Las Vegas residency and the 2019 JJ Concert Tour.

9.      On February 27, 2019, defendants ASARE, GANIERE, LAMICA and the FBI-UC participated in a telephone conference call. During that call, defendant LAMICA represented that he helped set up Janet Jackson's Las Vegas shows, confirmed Janet Jackson's commitment to the 2019 JJ Concert Tour, and claimed that the FBI-UC would receive a 35% return on his investment.

10.      On February 28, 2019, defendant ASARE sent an email to defendants LAMICA and GANIERE, copying the FBI-UC. In the email, defendant ASARE outlined dates for execution of the "Underwriting and Service Agreement" for the FBI-UC's investment

Case 2:19-mj-01806-DUTY Document 3 Filed 05/01/19 Page 7 of 19 PageID #:9

6

in the 2019 JJ Concert Tour (the "Agreement"). The dates included execution of the Agreement (3/1/19), payment of the binder or deposit (3/1/19)($2 million) and payment in full (3/11/19)($20 million).

11.    On March 8, 2019, the FBI-UC wired $25,000 from a bank account located in the Eastern District of New York to an account number provided by defendant LAMICA, as a down payment or binder to finance the 2019 JJ Concert Tour. The wire was received into a Wells Fargo bank account in California, in the name of Untouchable Management Group, LLC.

12.    On March 11, 2019, defendant GANIERE emailed the FBI-UC, copying defendants ASARE and LAMICA. In the email, defendant GANIERE confirmed receipt of the wire transfer and confirmed the possibility of a face-to-face meeting.

13.    On April 7, 2019, the FBI-UC met with defendants ASARE, LAMICA, GANIERE and CARRIKER at a location in Las Vegas, Nevada. During the meeting, which was recorded by the FBI, defendants ASARE, LAMICA, GANIERE and CARRIKER represented that Janet Jackson was committed to conducting the 2019 JJ Concert Tour and that the FBI-UC's entire $20 million investment would be utilized to finance that tour. During the meeting, defendants LAMICA and GANIERE insisted that the FBI-UC tender an additional $2 million as soon as possible. The FBI-UC agreed to wire the $2 million (minus the $25,000 already sent) by April 15, 2019. During the meeting, the FBI-UC and defendants GANIERE and LAMICA executed the Agreement. Finally, during the meeting, defendant LAMICA advised that Untouchable Management Group, LLC (the company to whom the $25,000 wire was sent) was his company.

7

14.    On April 11, 2019, defendant GANIERE emailed the FBI-UC, copying, defendants ASARE, LAMICA and CARRIKER, attaching a scanned copy of the fully executed AGREEMENT dated April 7, 2019.[5]

15.    On April 14, 2019, the FBI-UC called defendant LAMICA.  During the conversation, defendant LAMICA repeatedly pressured the FBI-UC to wire him $200,000 as part of the FBI-UC's "investment" in the 2019 JJ Concert Tour.  Moreover, defendant LAMICA told the FBI-UC that he personally spoke to Janet Jackson and that she personally committed to him (LAMICA) that she would do the 2019 JJ Concert Tour.  Finally, defendant LAMICA assured the FBI-UC that he already called the venues [for the 16 shows] and "laid down deposits" to hold the venues for the shows.

16.    On April 17, 2019, defendant CARRIKER and the FBI-UC spoke on the telephone.  During that conversation, defendant CARRIKER reiterated that Janet Jackson was committed to the 2019 JJ Concert Tour, that defendant LAMICA had an in-person conversation with Janet Jackson during which Janet Jackson confirmed her commitment to headline the 2019 JJ Concert Tour.  Further, defendant CARRIKER advised the FBI-UC that defendant LAMICA was instrumental in orchestrating Janet Jackson's Las Vegas residency at which Janet Jackson will be regularly performing for a set period of time.

17.    On April 17, 2019, FBI agents interviewed Randy Jackson, the brother and manager of Janet Jackson, who advised the agents that he did not know, nor had any business dealings with, KWASI ASARE, MARK LAMICKA, also known as Mark Lamica and Mark Lomicka, JAMES GANIERE or KEVIN CARRIKER.  Moreover, Randy Jackson told FBI agents that Janet Jackson did not commit the 2019 JJ Concert Tour or any concert

---

[5]    The executed Agreement is annexed hereto as Exhibit "A".

Case 2:19-mj-01806-DUTY Document 3 Filed 05/01/19 Page 9 of 19 PageID #: 11

tour in 2019.  Finally, Randy Jackson advised the agents that KWASI ASARE, MARK

LAMICKA, also known as Mark Lamica and Mark Lomicka, JAMES GANIERE or KEVIN

CARRIKER had absolutely no involvement in negotiating or securing Janet Jackson's Las

Vegas residency.

18.    On April 18, 2019, FBI agents interviewed the performer Janet Jackson

who advised the agents that she did not know, nor had any business dealings with, KWASI

ASARE, MARK LAMICKA, also known as Mark Lamica and Mark Lomicka, JAMES

GANIERE or KEVIN CARRIKER.   Moreover, Janet Jackson told FBI agents that she did not

commit the 2019 JJ Concert Tour or any concert tour in 2019. Finally, Janet Jackson advised

the agents that KWASI ASARE, MARK LAMICKA, also known as Mark Lamica and Mark

Lomicka, JAMES GANIERE or KEVIN CARRIKER had absolutely no involvement in

negotiating or securing her Las Vegas residency.

19.    A review of PACER records reveals that defendant MARK LAMICA

has a long history of defrauding investors in similar schemes.  For example, in 2008 the

defendant and his company Untouchable Entertainment were sued in the Western District of

Oklahoma after defendant LAMICA falsely maintained that he represented the band KISS and

accepted a total of $300,000 from plaintiff to invest in a farewell concert.  Plaintiff soon

learned that defendant LAMICA did not have authorization from the band KISS to enter into

any agreements to perform any concerts, however, defendant LAMICA refused to return the

$300,000 to the plaintiffs.  Thereafter, on September 28, 2011, a $300,000 default judgment

was entered on behalf of the plaintiffs against Untouchable Entertainment.

20.    In 2011, the City of Summerside, Prince Edward Island, Canada sued

various parties, including defendant LAMICA, in the Northern District of California, for

falsely representing that various international pop stars including Beyonce and Usher would perform in a Summer Tribute concert in Canada honoring the late Michael Jackson. Defendant LAMICA and others fraudulently obtained $1.6 million from the City of Summerside after promising the appearance of Beyonce and others at the Tribute Concert. Thereafter, the City of Summerside learned that "The Michael Jackson Tribute Show" was, from start to finish, an elaborate fraud scheme. No such concert existed and neither Beyonce, Usher or any other performers agreed to perform at, or even knew about, this purported concert. Thereafter, on October 30, 2013, a $1.6 million default judgement was entered on behalf of the City of Summerside against defendant LAMICA and others.

21.    A review of defendant CARRIKER's criminal also history reveals a long history of defrauding victims. For example, in 2003, defendant CARRIKER was convicted of grand larceny in California for defrauded several elderly victims of between $50,000 and $125,000 by stealing their gold and silver collectible coins. Moreover, also in 2003, after embezzling $75,000 from an employer, defendant CARRIKER robbed said employer and a co-worker, and stabbed his employer and threatened to kill his co-worker. Defendant CARRIKER is currently on state parole for these offenses after serving approximately 13 years in prison.

22.    WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants KWASI ASARE, MARK LAMICKA, also known as Mark

Case 2:19-mj-01806-DUFY   Document 3   Filed 05/01/19   Page 11 of 19   Page ID #: 13

10

Lamica and Mark Lomicka, JAMES GANIERE and KEVIN CARRIKER, so that they may be

dealt with according to law.

_____
MATTHEW GALIOTO
Special Agent, Federal Bureau of Investigation


Sworn to before me this
19th day of April, 2019

_____
THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## UNDERWRITING AND SERVICE AGREEMENT

THIS NON-EXCLUSIVE UNDERWRITING AND SERVICE AGREEMENT (this "Agreement") is made and entered into by the following two parties in Las Vegas, Nevada on April 7, 2019.

(1) Rio Vista Universal, Inc., a Wyoming corporation having their legal address at 30 N Gould St, #R Sheridan, WY 82801 and phone (307) 200-2088, hereinafter referred to as "Party A" or "RVU"

(2) ███████████, a Delaware corporation having their legal address at ███████████████ ████████ and phone ███████████ hereinafter referred to as "Party B" or "PII" (collectively referred to as "Parties" and individually as "Party.")

### Preamble

WHEREAS, Party A is in the business of covering concert producing, marketing and promotions with additional emphasis on public relations.

WHEREAS, Party B is in the business of finance who invests in projects and desires to underwrite concerts and utilize Services;

NOW, THEREFORE, for adequate consideration, the sufficiency of which is hereby acknowledged, the Parties, after friendly negotiations, hereby agree below:

### Article 1 Definitions

1.1 Except as otherwise provided herein or where the context otherwise requires, the following terms used herein shall have the following meanings:

"Business" means production of Concert(s) with regard to Party B's underwriting and limited to those engagements that Party A establishes throughout the term of this Agreement.

For tax and accounting purposes all California concert(s) moneys and logistics shall be run through UNTOUCHABLE MANAGEMENT GROUP LLC entity, as a co-production, affiliate and synonymous with Party A.

For marketing, "PSL" means Person Seat Licenses for the venue. PSL for Petco Park are currently 53% of the stadium. "CPL" means Concert Presale List to the venue's registered users list, which is currently well over 300,000 people, according to venue's representations over email. This is an example of our venues.

"Services" means the marketing and business promotion services in connection with the Business provided by Party A within its business scope exclusively to Party B, including, but not limited to:

(1) Booking Venue
(2) Booking Talent
(3) Production
(4) Logistics
(5) Marketing
(6) Promotions

"Underwriting Fees" means all the fees payable by Party B to Party A set forth within Article 3 with respect to the Business and Services provided by Party A.

"Customer Information" has the meaning as ascribed to it under Article 7.1.

"Confidential Information" has the meaning as ascribed to it under Article 7.2.

"Defaulting Party" has the meaning as ascribed to it under Article 12.1.

"Default" has the meaning as ascribed to it under Article 12.1.

"Rights" has the meaning as ascribed to it under Article 13.5.

1.2 The references to any laws and regulations (hereinafter the "Laws") herein shall be deemed:

    (1) to include the references to the amendments, changes, supplements and reenactments of such Laws, regardless of whether they take effect before or after the date of this Agreement

    (2) to include the references to other decisions, notices or regulations enacted in accordance therewith or effective as a result thereof.

1.3 Except as otherwise stated in the context herein, all references to an article, clause, item or paragraph shall refer to the relevant part of this Agreement.

## Article 2 Services

2.1 Party A shall diligently provide Services to Party B pursuant to the needs of the Business and the conditions stipulated herein. For this purpose, Party A shall have in place the resources and personnel reasonably necessary for the provision of the Services and acquire the equipment and personnel to provide Business and Services for Party B.

2.2 For the purpose of provision of the Services, Party A shall promptly communicate with Party B all information relevant to the Business with reasonable detail, including any adjustment to the date, venue and artist.

Article 3 Concert(s)

3.1 The concert or tour is <u>sixteen</u> date(s) with the artist <u>Janet Jackson</u> beginning at the Petco Park in San Diego venue with a total Underwriter Fee of $20 million USD.

| Route | City | State | Investor Profit | Underwriting Fee |
|---|---|---|---|---|
| 1 | San Diego | CA | $400,000 | $4,000,000 |
| 2 | Phoenix | AZ | $400,000 | $4,000,000 |
| 3 | Dallas | TX | $400,000 | $4,000,000 |
| 4 | Houston | TX | $400,000 | $4,000,000 |
| 5 | New Orleans | LA | $400,000 | $4,000,000 |
| 6 | Atlanta | GA | $400,000 | $4,000,000 |
| 7 | Charlotte | NC | $400,000 | $4,000,000 |
| 8 | Baltimore | MD | $400,000 | $4,000,000 |
| 9 | Philadelphia | PA | $400,000 | $4,000,000 |
| 10 | New York | NY | $400,000 | $4,000,000 |
| 11 | Pittsburgh | PA | $400,000 | $4,000,000 |
| 12 | Indianapolis | IN | $400,000 | $4,000,000 |
| 13 | Chicago | IL | $400,000 | $4,000,000 |
| 14 | Minneapolis | MN | $400,000 | $4,000,000 |
| 15 | Denver | CO | $400,000 | $4,000,000 |
| 16 | San Francisco | CA | $400,000 | $4,000,000 |
| $20 Million Investment | | Profit | $6,400,000 | |
| | | Return | 32% | |
| | | Annualized | Over 50% | |
| * 2 Dates per week, with minimum 90 day runway for 1st date. | | | | |
| ** Cities are subject to change due to routing and logistics | | | | |
| *** Re-deploy 20 Million Tour Underwriting Fee multiple times to cover the individual concert underwriting fee and maximize return. | | | | |

3.2 Adequate insurance will be provided to protect the investment. Insurance policies will cover venue, talent and event.

3.3 Underwriter Perks Available for Party B include:
    (1) VIP backstage experience passes
        a.  Meet the Talent
        b.  Red Carpet
        c.  Getty photos with Talent
    (2) Red Carpet with Step and Repeat
        a.  Logo included on Step and Repeat
        b.  Press
            i.  Talent and Celebrities on Red Carpet
           ii.  Free tickets for press outlets covering the concert
          iii.  Getty photographer coverage and publishing (In-house)
    (3) Where appropriate Party B's brand will be included in the promotion of Concert(s)
        a.  Tickets
        b.  Radio
        c.  Online

Article 4 Underwriting Fees

4.1 With respect to the Services to be provided by Party A pursuant to this Agreement, Party B agrees to pay Party A, pursuant to Article 4.1 hereof, the Underwriting Fees of $20,000,000.00 as follows:

4/8/2019 - $2,000,000 Signing Binder due (10% of Underwriting Fees),
5/8/2019 - $18,000,000 Remaining deposit due upon Party A providing proof of contracts for venues and artist for deposits to be made, time being of the essence. Party A anticipates 30 business day for entire tour to be set, beyond the initial dates.

4.2 The Parties agree that the Underwriting Fees should be repaid as follows:

(1) Party A shall repay Party B 110% Underwriting Fees for concert (original **Underwriting Fees + 10% interest on Underwriting Fees (Interest)** using the following **FIFO** (First In First Out) method (will be paid from the gross before net) within 5 business days after each concert(s) performance is finished by Direct Deposit (ACH Transfer) or Federal Bank Wire.

(2) Party B principle and interest will be repaid as a first priority and highest legal seniority from ticket sale revenue. In the case of concerts or tours or continuing reinvesting for a time period Party B's principle to pay any remaining deposit due on the next concert date and the remainder to set up future dates. Once fulfilled Party B principle shall be returned.

(3) The 5-day deadline shall be equitably extended in the event of a delay from Tickets.com or the Ticket Company in releasing the ticket proceeds following the concert.

(4) To ensure repayment of the Underwriting Fees, Party A shall offer as collateral all tickets proceeds and cross collateralize any streaming deals along with all other streams of revenue of Party A with respect to this specific concert(s).

(5) Underwriting Fees shall be transferred by Direct Deposit (ACH Transfer) or Federal Bank Wire pursuant to the instructions set forth below (the wiring instructions for the escrow account for the remaining portion to be shared under separate cover):

    a.  Party A
       Account Name: UNTOUCHABLE MANAGEMENT GROUP LLC
       Account#: 3026565956
       Routing#: 121000248 (Wells Fargo Bank, Beverly Hills, CA 90210)
       International Routing or Swift Number: WFBIUS6S

    b.  Party B

       Account Name: _____

       Account#: _____

       Routing#: _____

4.3 Schedule of Dates
      3/16/2019 - $25,000 Deposit
      4/07/2019 - Sign agreement
      4/08/2019 - $1,975,000 Party B Wire (Binder) to Party A
      5/08/2019 - $18,000,000 Wire by Party B (Balance of Concert Tour Underwriting Fees) to Party A
      7/27/2019 - Concert(s) (See Section 3)

## Article 5 Party A's Obligations

5.1 The Services hereunder shall be provided by Party A on a non-exclusive basis. During the validity term of this Agreement, without requiring prior written consent of Party B, Party A may enter into any agreement with any third party or otherwise agree to engage such third party to provide the services, work product or material similar or even identical to those provided by Parties.

5.2 In order to facilitate Party A's provision of the Services, Party B shall provide Party A with relevant materials required by Party A in a timely manner.

5.3 Parties shall pay the Underwriting Fees to Parties on time and in full according to Article 3 hereof.

5.4 In the event that Party A be unable secure contracts for deposits Party A shall refund Party B Binder.

5.5 Party A shall take reasonable measures to maintain its good reputation and actively develop its business to pursue maximum profits.

## Article 6 Intellectual Property Rights

6.1 Intellectual property rights on the marketing and promotion work product created during Party A's provision of Services shall belong to Party A.

6.2 Intellectual property rights on business and project work product created or promoted during Party A's provision of Services shall belong to Party A.

## Article 7 Confidentiality

7.1 Throughout the term of this Agreement, all affiliate, contractor, sources and customer information related to Party A's Business and the Services provided by Party A hereunder as well as other relevant materials (hereinafter the "Customer Information") shall be owned by the Party A.

7.2 Whether this Agreement is terminated or not, the Parties shall be obliged to keep in strict confidence business secrets, proprietary information and business information of the other Party acquired during the execution and performance of this Agreement, Customer Information and all other information of a confidential nature (hereinafter the "Confidential Information"). The receiving Party of the Confidential Information shall not disclose any Confidential Information to any third party except with the prior written consent of the other Party, or required by relevant laws and regulations or listing requirements. The receiving Party may not use, directly or indirectly, such Confidential Information for purposes other than performing its obligations under this Agreement.

7.3 The following information is not Confidential Information:

(a) any information that is proved by written evidence to be known to the receiving Party previously by any legal means;

(b) any information that comes into public domain through no fault of the receiving Party, or becomes known to the public for other reasons;

(c) any information that is rightfully obtained by the receiving Party by other means after receiving such information.

7.4 The receiving Party may disclose the Confidential Information to its relevant employees, agents or professionals it retains, but shall ensure that such persons obey the relevant terms and conditions of this Agreement and assume any liabilities arising from the breach of the relevant terms and conditions of this Agreement by any of the foregoing persons.

## Article 8 Representations and Warranties

8.1 Party A hereby represents and warrants that:

8.1.1 it is a corporation duly registered and validly existing under the Wyoming Law

8.1.2 it has full power and authorization to execute and deliver this Agreement and all other documents related to the transaction contemplated hereunder and to be executed by it, and it has full power and authorization to complete the transaction contemplated hereunder. This Agreement shall be lawfully and duly executed and delivered by it and shall constitute a legal and binding obligation on it and is enforceable against it pursuant to the terms hereof;

8.1.3 it has obtained complete business permits necessary for its operations upon effectiveness of this Agreement; it has sufficient rights and qualification to conduct the business it is currently engaged in as well as the other Business as conducted now

8.1.4 it shall notify Party B in a timely manner of any situation which has or may have material adverse effect on its Business and operation, and shall make its best efforts to prevent the occurrence of such situation and/or the expansion of losses;

8.1.5 without written consent from Party B, Party A shall not, in whatever way, dispose of its material assets or change its current structure.

8.2 Party B hereby represents and warrants that:

8.2.1 it has full corporate internal power and authorization to execute and deliver this Agreement and all other documents related to the transaction contemplated hereunder and to be executed by it, and it has full power and authorization to complete the transaction hereunder. This Agreement shall be lawfully and duly executed and delivered by it and shall constitute a legal and binding obligation on it and is enforceable against it pursuant to the terms hereof.

## Article 9 Term of Agreement

9.1 The Parties hereby acknowledge that this Agreement becomes effective upon formal signing by the Parties. Unless terminated by the Parties in writing, this Agreement shall continue in force and effect until it is not extended by Parties.

## Article 10 Indemnification

10.1 Party A shall indemnify and hold Party B harmless from and against any and all damages that are or may be suffered by Party B as a result of its provision of the Services, including, but not limited to, those caused by or arising from any lawsuit, repayment pursuit, arbitration or claim made by any third party or any administrative investigation or penalty by any government authority against Party B, provided, however, that the damages arising from Party B's intentional misconduct or gross negligence shall not be entitled to such indemnification.

## Article 11 Notices

11.1 Any notice, request, demand or other communications required to be given or made under or pursuant to this Agreement shall be in writing and delivered to the receiving Party.

11.2 The notices or other communications shall be duly given: if sent by fax, email or telex, upon transmission; if delivered by hand delivery, when delivered; if delivered by mail, after five (5) days of posting.

## Article 12 Defaulting Liabilities

12.1 The Parties agree and acknowledge that, if any Party (hereinafter the "Defaulting Party") commits material breach of any provision hereof, or materially fails to perform any obligation hereunder, such breach or failure shall constitute a default under this Agreement (hereinafter a "Default"), then the non-defaulting Party shall be entitled to demand the Defaulting Party to rectify such Default or take remedial measures within a reasonable period. If the Defaulting Party fails to rectify such Default or take remedial measures within such reasonable period or within fifteen (15) days following the written notice issued by the non-defaulting Party and the rectification requirement, the non-defaulting Party shall be entitled to decide to, at its discretion: (1) terminate this Agreement and require the Defaulting Party to indemnify all the damages; or (2) require the performance of the obligations hereunder and require the Defaulting Party to indemnify all the damages.

12.2 Notwithstanding any other provisions herein, the validity of this Article 12 shall survive the suspension or termination of this Agreement.

## Article 13 Miscellaneous

13.1 This Agreement may be executed in counterparts, all of which when taken together shall constitute one and the same agreement. Facsimile and electronic signatures shall have the same force and effect as original signatures. Parties shall sign additional copies and/or clarifying documents upon request of parties without additional consideration.

13.2 Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a panel of three arbitrators in New York, New York, in accordance with the rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction; the expense of such arbitration shall be borne by the losing party.

13.3 Any, powers and remedies granted to any Party by any provisions herein shall not preclude any other rights, powers and remedies available to such Party in accordance with laws and other provisions under this Agreement, and the exercise of its rights, powers and remedies by a Party shall not preclude its exercise of any other rights, powers and remedies available to it.

13.4 No failure or delay by a Party in exercising any of its rights, powers and remedies hereunder or in accordance with law (hereinafter the "Rights") shall be construed as a waiver of such Rights, and the waiver of any single or partial exercise of the Rights shall not preclude its exercise of such Rights in any other way and other Rights.

13.5 Underwriting Fees, funds and/or payments are non-refundable except as otherwise set forth herein.

13.6 The headings herein contained are inserted for reference only and in no circumstances shall such headings be used in or affect the interpretation of the provisions hereof.

13.7 Each provision contained herein shall be severable and separate from other provisions, and if at any time one or more provisions herein become invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions herein shall not be affected as a result thereof.

13.8 Once executed, this Agreement shall supersede other legal instruments previously executed by both Parties in connection with the subject matter hereunder. Any amendment or supplement to this Agreement shall be binding only by a written instrument duly executed by the Parties.

13.9 Neither Party shall assign any of its rights and/or obligations hereunder to any third party without the prior written consent of the other Party.

13.10 This Agreement shall be binding on the respective legal successors of the Parties.

13.11 Day(s) are defined as business days.

13.12 The Parties undertake that they shall respectively make tax declaration and payment pursuant to law in connection with the transaction hereunder.

IN WITNESS WHEREOF, the Parties hereto have caused this Underwriting and Service Agreement to be executed as of the date and in the place first above written. The Above agreement is entered into under the laws of the State of New York and subject to the laws and restrictions therein.

ACCEPTED AND AGREED TO BY:

Party A

_____
(Signature)

James Ganiere

Title: President

Company: Rio Vista Universal, Inc

Address: 9350 Wilshire Blvd, Ste 203,

_____ Beverly Hills, CA 90212

Phone: (323) 334-0111

Email: James@RioVistaUniversal.com

Party A

_____
(Signature)

Mark Lamica

Email: Mark@RioVistaUniversal.com

ACCEPTED AND AGREED TO BY:

Party B

_____
(Signature)

_____
(Print Name)

Title: _____

Company: _____

Address: _____

_____

Phone: _____

Email: _____